# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 10, 2026

Lyle W. Cayce
Clerk

No. 25-50367

———————

PAUL PARROTT, *as the Representative of a class of similarly situated persons, and on behalf of the International Bancshares Corporation* EMPLOYEES' PROFIT SHARING PLAN and TRUST,

*Plaintiff—Appellee*,

*versus*

INTERNATIONAL BANCSHARES CORPORATION; INTERNATIONAL BANCSHARES CORPORATION PROFIT SHARING PLAN COMMITTEE; INTERNATIONAL BANK OF COMMERCE,

*Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:24-CV-1263

———————————————————

Before ELROD, *Chief Judge*, and SMITH and WILSON, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

## I. Introduction

International Bancshares Corporation ("IBC") is a bank holding company that owns and operates five banks in Texas and Oklahoma. IBC is the sponsor of a tax-deferred defined contribution retirement savings plan (the "Plan"). IBC Profit Sharing Plan Committee ("PSPC") is the Plan's named

administrator and fiduciary and is composed of IBC board members. An IBC subsidiary, International Bank of Commerce, controls investment of the Plan's assets; IBC and PSPC also have authority over the investment of the Plan's assets.[1]

The plaintiff, Paul Parrott, worked at an IBC bank until 2021 and was a Plan participant. He alleges that IBC, PSPC, and International Bank of Commerce breached their fiduciary duty, causing Parrott's distribution to be diminished.

In March 2024, IBC amended the Plan to include an arbitration clause, which was made retroactive to January 1, 2024. Parrott had already received his distribution before January 1, 2024, and was no longer employed by IBC. The relevant arbitration provisions are reproduced below:

> Section 11.09 - ARBITRATION REQUIREMENT AND PROCEDURE
>
> (a) General. Subject to and without waiver of full compliance with the Plan's benefit claims procedures and the corresponding provisions of the summary plan description for this Plan, which must be exhausted with respect to any claim before any arbitration pursuant to this Section 11.09, all Covered Claims (as defined in Section 11.09(b)) must be resolved exclusively pursuant to the provisions of this Section. The judgment on the final award the arbitrator(s) renders may be entered in any court having jurisdiction thereof and shall be res judicata as to all Covered Claims the Arbitration Claimant (as defined in Section 11.09(b)) asserted or could have asserted in the arbitration demand. For the purposes of this Section, the term "IBC" means the Plan Sponsor, International Bancshares Corporation.

---

[1] The appellants are collectively referred to as IBC unless otherwise noted.

No. 25-50367

\*\*\*\*

(i) Waiver of Judge and Jury. Each Arbitration Claimant, whether pursuing a claim for benefits or other relief on behalf of the Plan as a whole, by participating in this Plan, is specifically waiving the right it otherwise would have had to sue IBC, Trustee, the Plan Administrator or any party to whom administration or investment discretion is delegated hereunder in court and to have such claims decided by a judge or jury. This jury trial waiver is a separate and distinct agreement between all Arbitration Claimants and IBC. If for any reason the agreement to arbitrate under this Section is deemed unenforceable, the agreement to pursue claims in a non-jury trial shall remain in full force and effect.

\*\*\*\*

(h) No Group, Class, or Representative Arbitrations. All Covered Claims must be brought solely in the Arbitration Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis. Each arbitration shall be limited solely to one Arbitration Claimant's Covered Claims. It is the intent of this Section that disputes be resolved on an individualized basis between an individual Arbitration Claimant and IBC. It is agreed that no dispute shall be certified as a class or collective action, or on a basis involving claims brought in any purported representative capacity on behalf of current or former employees, applicants or other persons similarly situated and no arbitration proceeding under this Section shall be consolidated with, or joined in any way with, any other arbitration proceeding. Arbitration Claimant and IBC hereby waive any right to participate in a class or collective action or any representative proceeding (the "Class Action Waiver"). Arbitration Claimant and IBC shall be required to pursue any claims on an individual basis under this Section.

After Parrott filed an ERISA suit against the defendants under 29 U.S.C. § 1132(a)(2)-(3), alleging violations of fiduciary duties, the

defendants moved to compel arbitration on the basis of the above provisions. The district court denied the defendants' motion to compel arbitration, finding that there was no consideration under Texas law for the amended arbitration agreement. IBC appeals that ruling, asserting that the district court erred in denying the motion to compel arbitration.

IBC raises one issue and preemptively responds to two others. First, it claims that the arbitration provision is valid and enforceable against Parrott. Second, it urges that this court should not adopt the effective vindication doctrine in this context. Third, it claims that the Plan does not unlawfully "water down" the standard of review for fiduciary actions. We address each point in turn.

## II. Is the Arbitration Clause Valid and Enforceable Against Parrott?

We review *de novo* the denial of a motion to compel arbitration. *Bufkin Enters., L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726, 729 (5th Cir. 2024). The Federal Arbitration Act ("FAA") "was designed 'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and place such agreements 'upon the same footing as other contracts.'" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (first quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985); and then quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). The Act establishes "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "[T]here is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

The FAA embodies the "overarching principle that arbitration is a matter of contract." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). "[C]ourts must 'rigorously enforce' arbitration agreements accord-

No. 25-50367

ing to their terms." *Id.* (quoting *Dean Witter Reynolds*, 470 U.S. at 221). That is true, even for claims that allege violations of a federal statute, unless the "FAA's mandate has been overridden by a contrary congressional command." *Id.* (quoting *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)).

"Enforcement of an arbitration agreement involves two analytical steps. The first is contract formation—whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). Whether the parties entered into a valid contract turns on state contract law. *Id.* at 202.

"Consent is essential under the FAA because arbitrators wield only the authority they are given. That is, they derive their 'powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution.'" *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). "A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'"[2] "Under that principle, the FAA preempts any state rule discriminating on its face against arbitration—for example, a law prohibiting outright the arbitration of a particular type of claim." *Id.* (alterations in original) (quoting *Kindred Nursing*, 581 U.S. at 251).

---

[2] *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) (quoting *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017)).

A.

IBC claims that the federal policy in favor of arbitration "weighs in favor of reversing the district court and compelling arbitration." IBC also asserts that the arbitration provision is valid under Texas law. IBC posits that Parrott's individual consent to arbitration is irrelevant, as it is the Plan itself that needs to consent to unilateral amendment. IBC relies on *Berkelhammer v. ADP Totalsource Grp.*, 74 F.4th 115, 117 (3d Cir. 2023), for the proposition that it is "*the plan*, as an entity, that has a contract with its trustees, *not the individual plan participants . . .* so any agreement to resolve fiduciary disputes is between *the plan* and the trustees." IBC contends that the Plan consented to the arbitration agreement when IBC, as plan sponsor, amended the Plan.

Parrott says that neither he nor the Plan consented to arbitration. He suggests that IBC is mistaken to conclude that the Plan's consent matters in regard to § 1132(a)(2) because the right to sue is conferred on the litigant, not the Plan. As to the Plan, Parrott claims that it cannot and did not consent to arbitrate through a unilateral amendment added by the plan sponsor.

Parrott's position starts from the first principles of ERISA, noting that the Plan and its sponsors are distinct entities, meaning that the actions of the sponsor and the Plan cannot be construed as one. Furthermore, Parrott states that IBC's only other option—acting on behalf of the Plan—is impossible because it is the Plan's fiduciaries, not the sponsors, who act on behalf of the Plan, and amending a Plan is not a fiduciary act.

Parrott also claims that IBC fundamentally misunderstands ERISA, as the Plan is not a contracting party, but instead represents a unilateral contract between the plan sponsor and its employees. Parrott contends that *Berkelhammer* supports his position, given that the arbitration agreement that the plan consented to was external to the plan. On the § 1132(a)(2) issue, Parrott concludes by suggesting that cases from the Ninth Circuit and various district

courts are circular when they state that the plan consents by granting the sponsor unilateral amending authority, as the grant of authority was also unilateral. Parrott closes by asserting that his § 1132(a)(3) claims should not be compelled to arbitration because he did not consent to arbitrate in the first place.

B.

IBC is correct that the district court erred in finding that Parrott's lack of consent foreclosed enforcement of the arbitration clause with regard to the § 1132(a)(2) claim, given that the Plan is the relevant party for § 1132(a)(2). Though the issue of the Plan's consent is somewhat close, it ultimately comes out in favor of IBC. To the extent that IBC seeks to compel arbitration on Parrott's individual claims, the district court did not err in denying the motion to compel arbitration.

1.

Section 1132(a)(2) states that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109 states, in part, that a plan fiduciary that violates its fiduciary duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

As the Third Circuit noted in *Berkelhammer*, the entire thrust of § 1109 is the vindication of injuries to the plan. 74 F.4th at 119. Likewise, as the Supreme Court noted in *LaRue v. DeWolff, Boberg & Associates*, even to the extent that a § 1132(a)(2) claim can be brought to vindicate a breach of fiduciary duty to an individual account, § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries." 552 U.S. 248, 256

7

(2008). Thus, a claim under § 1132(a)(2) is always brought "on behalf of a plan to recover for violations of the obligations" defined in § 1109. *Id.* at 253.[3] Because ERISA puts the plan at the center of the relevant provisions, it points "to the plan, not the participants, as the relevant contracting party." *Berkelhammer*, 74 F.4th at 119.

The weight of persuasive authority strongly favors this reading. As previously noted, *Berkelhammer* concluded that the plan was the relevant contracting party. Likewise, *Platt v. Sodexo*, 148 F.4th 709, 720 (9th Cir. 2025), and *Hawkins v. Cintas*, 32 F.4th 625, 631–35 (6th Cir. 2022), conclude that a plan's consent itself is the only consent necessary. Parrott cites no authority for his theory that the litigant's consent is important because the statutory right to bring the claim is bestowed on the litigant. It is the consent of the Plan that is relevant.

IBC is also correct that the Plan consented. Parrott's notion that the Plan did not consent erroneously relies on *Hawkins* for the proposition that the consent of the sponsor and the consent of the plan cannot be one and the same. In *Hawkins*, the sponsor claimed, through an agency theory, that the sponsor can bind the Plan.[4] In contrast, IBC contends that the Plan's consent was valid because it was properly added to the Plan through the Plan's unilateral amendment provision. "ERISA plans are to be administered according to their controlling documents." *Tucker v. Shreveport Transit Mgmt. Inc.*,

---

[3] *See also Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985) ("Inclusion of the Secretary of Labor is indicative of Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes is in the financial integrity of the plan.").

[4] *See* 32 F.4th at 636 ("Noting that the Plan can only act through its agents, [the sponsor] suggests that a plan sponsor, acting alone, can enter into agreements that bind a plan. It also suggests that because the sponsor has consented to arbitration (including by filing this lawsuit) the Plan has also consented.").

226 F.3d 394, 398 (5th Cir. 2000) (discussing the proposition in the beneficiary context). Here, as in *Platt*, the Plan "expressly cede[s] broad authority to [the sponsor] to amend its terms," meaning that the Plan has consented to any changes that the sponsor makes, irrespective of the fact that amending is a non-fiduciary act. 148 F.4th at 720.

Furthermore, Parrott's entire theory hinges on a citation to a Seventh Circuit case that states, "any and all actions taken by a plan are done by the administrators who act on its behalf—in other words, by the fiduciaries who exercise discretionary authority or control with respect to the management of a plan." *Line Constr. Benefit Fund v. Allied Elec. Contractors, Inc.*, 591 F.3d 576, 579 (7th Cir. 2010). That statement is excised from its context. The court was remarking on the ability of a plan to be a fiduciary of itself, ultimately concluding that it can. *Id.* at 579–80. The court did not try to speak to whether a fiduciary act must take place in order for a plan to manifest consent. In other words, the case is not relevant. But even if we took *Allied Electric* at its word, the relevant fiduciary act, to the extent one is necessary, occurred when the Plan ceded the amendment authority in the first instance to the sponsor and only the sponsor. To hold otherwise would be to find that ERISA has a *per se* ban on unilateral amendment of arbitration provisions by plan sponsors, something foreign to the text of the FAA and the caselaw.

## 2.

With regard to Parrott's individual claims, it is undisputed that he did not consent to the arbitration agreement personally. IBC does not assert, at any point in its briefing, that Parrott consented to the arbitration agreement. Instead, IBC only suggests that the Plan consented and that such consent was sufficient to require "any person seeking to bring claims on the Plan's behalf . . . [to] adjudicate those claims through arbitration." Therefore, to the extent that IBC sought to challenge the district court's rejection of the

No. 25-50367

motion to compel arbitration as to Parrott's individual claims, it failed to brief such a position adequately and thus forfeited the issue.  Even if it were not forfeited, the result is unchanged, as "arbitration is a matter of consent" and Parrott provided no such consent.  *Stolt-Nielsen S.A.*, 559 U.S. at 684.

## III.  Does the Arbitration Provision Run Afoul of the Effective Vindication Doctrine?

The Supreme Court has acknowledged an exception to the FAA's general policy in favor of arbitration known as the effective vindication doctrine.  *Am. Express*, 570 U.S. at 235.  The doctrine requires a court to invalidate arbitration agreements that "operat[e] . . . as a prospective waiver of a party's *right to pursue* statutory remedies."  *Id.* (alteration in original) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).  The effective vindication doctrine reaches "provision[s] in an arbitration agreement forbidding the assertion of certain statutory rights."  *Id.* at 236.  Though we have not had occasion to address the doctrine directly, several of our sister circuits have applied it in analogous contexts.[5]

### A.

IBC primarily reasons that the effective vindication doctrine does not apply at all, or alternatively, the representative action waiver and remedy limitation are not invalid under that doctrine because Parrott can obtain "all of the relief available to him under ERISA through individual arbitration."  IBC further urges that even if it the provision did run afoul of the effective vindi-

---

[5] *Platt*, 148 F.4th at 721; *Parker v. Tenneco, Inc.*, 114 F.4th 786, 793 (6th Cir. 2024), *cert denied*, 145 S. Ct. 1060 (2025); *Fleming v. Kellogg Co.*, No. 23-1966, 2024 WL 4534677, at *8 (6th Cir. Oct. 21, 2024); *Cedeno v. Sasson*, 100 F.4th 386, 400-01 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 447 (2024); *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Dirs.*, 59 F.4th 1090, 1112 (10th Cir. 2023); *Henry v. Wilmington Tr. N.A.*, 72 F.4th 499, 507 (3d Cir. 2023); *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 621–22 (7th Cir. 2021); *Williams v. Shapiro*, No. 24-11192, 2025 WL 3625999 (11th Cir. Dec. 15, 2025).

cation doctrine, that provision would be severable per the severability clause in the Plan.

IBC asserts that the effective vindication doctrine does not apply in the context of an ERISA claim because (1) the Supreme Court has acknowledged but has not applied the doctrine in any case and (2) the Fifth Circuit has frequently found that ERISA claims are arbitrable. IBC's theory that the arbitration clause is valid even if the effective vindication doctrine does apply relies on the assumption that because ERISA does not mandate class-wide relief but only permits it, there is no effective vindication issue.

Parrot's position on the effective vindication doctrine relies on the growing number of our sister circuits that have recognized violations of the doctrine in the context of ERISA and limitations on representative actions. Parrott claims that IBC misunderstands the issue as ERISA's and the FAA's being in conflict, when in reality the issue is the arbitration clause's conflicting with ERISA, implicating the effective vindication doctrine as it relates to the FAA. According to Parrott, the forbidding of representative arbitrations in the Plan prevents an individual from bringing a representative action on behalf of the Plan, the primary purpose of a § 1132(a)(2) claim. Furthermore, Parrott proposes that even if an individual is able essentially to get individual relief under § 1132(a)(2), that effective individual relief must still come when proceeding through a § 1132(a)(2) claim in a representative capacity.

Parrott also avers that the provision providing for only individual relief violates the effective vindication doctrine, given that it limits the relief that can be obtained in ERISA, which permits a representative to recover "any losses to the plan." 29 U.S.C. § 1109(a). Parrott cites many of the same out-of-circuit ERISA-FAA cases for the proposition that limiting a § 1132(a) representative to individual damages is an impermissible waiver of statutory remedies. Parrott bolsters the argument of impermissible waiver by refer-

encing the statutory text of § 1109(a), which provides that a breaching fiduciary "shall be personally liable to make good to [the] plan *any* losses to the plan resulting from each breach," and "*shall* . . . restore to [the] plan *any* profits the fiduciary made "through use of" plan assets. Parrott concludes his argument on effective vindication by asserting that the remedy limitation and representative-action waiver are not severable on account of the arbitration clause's stating that "[t]he requirements that . . . [an] Arbitration Claimant . . . shall not be awarded, any relief other than individual relief, shall govern irrespective of any rule of the AAA or decision to the contrary."

### B.

IBC violated the effective vindication doctrine with its arbitration provisions. The anti-representative-action clause states that "[a]ll Covered Claims must be brought solely in the Arbitration Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis." That requirement is facially at odds with the statutory text of § 1109 and the remedy it provides.

Section 1109 states that a violating fiduciary is liable to "make good to such plan *any losses* to the plan resulting from each such breach, and to restore to such plan *any profits* of such fiduciary which have been made through use of assets of the plan by the fiduciary." That language, when paired with § 1132(a)(2), which states that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title," gives the Secretary, plan participant, beneficiary, or fiduciary the authority to seek relief for *any* losses to the plan. As the Supreme Court has noted on several occasions, the word "any" has an expansive meaning. *Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020). The capacious scope of "any" means that the remedy provided for in this instance is that a § 1132(a)(2) plan participant can seek to recover all losses and reclaim

all profits that resulted from the breach of fiduciary duties.

The conclusion above is further supported by Supreme Court precedent that makes it evident that any action on the basis of § 1132(a)(2) authorizes a plan participant "to bring actions *on behalf of a plan* to recover for violations of the obligations defined in § 409(a)." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 253 (2008). IBC's idea that ERISA only permits rather than requires class-wide relief fundamentally misses the point. "[A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256.

So, although *LaRue* may stand for the proposition that there can be plan injuries to individual accounts, it does nothing to undermine the principle that such suits are still brought on behalf of the plan and thus in a representative capacity. To that effect, *LaRue* states that § 1132(a)(2) "authorizes the Secretary of Labor as well as plan participants, beneficiaries, and fiduciaries, to bring actions on behalf of a plan." *Id.* at 253. Because § 1132(a)(2) suits, by definition, must be brought in a representative capacity and plan participants are entitled to bring suit to recover all losses and profits, the anti-representative-action clause and remedy limitation are violative of the effective vindication doctrine.

This reading is supported by multiple circuits. In *Platt v. Sodexo*, the Ninth Circuit found that a representative-action waiver violated the effective vindication doctrine because it prevented a plaintiff "from obtaining . . . plan-wide relief." *Platt*, 148 F.4th at 721. In *Harrison v. Envision Management Holding Inc. Board of Directors*, the Tenth Circuit found a remarkably similar provision prevented the plan participant from vindicating his statutory rights when it prevented him from suing in a representative capacity on behalf of

the plan on the whole.[6]  In *Fleming v. Kellogg Corp.*, the Sixth Circuit recognized that an arbitration clause that forbade a suit in a representative capacity violated the effective-vindication doctrine.  No. 23-1966, 2024 WL 4534677, at *4-6 (6th Cir. Oct. 21, 2024).  *Fleming* also convincingly demonstrated that the flaw with IBC's theory's differentiating between suits for individual accounts and suits for the plan on the whole is that both suits are brought by a plaintiff in a representative capacity.  *Id.* at *4-5.[7]  In *Cedeno v. Sassoon*, 100 F.4th 386, 400–01 (2d Cir. 2024), the Second Circuit decided the same, and in *Henry ex rel. BSC Ventures Holdings, Inc. Employee Stock Ownership Plan v. Wilmington Trust NA*, 72 F.4th 499, 507 (3d Cir. 2023), the Third Circuit came to the same conclusion.

## C.

As to severability, the Plan is governed by Texas law.  We apply applicable state law when assessing the existence of a valid arbitration agreement unless the state law is preempted by federal law.[8]  Here, there is no evidence,

---

[6] 59 F.4th at 1106–07 ("The emphasized portion of this sentence would clearly prevent Harrison from obtaining at least some of the forms of relief that he seeks in his complaint pursuant to § 1132(a)(2), including (a) the imposition of liability on the ESOP Committee Defendants and Argent for losses suffered by the Plan generally.").  It was violative for a variety of additional reasons, but each should be an independent ground for finding violations of the effective-vindication doctrine.  *Id.* at 1107.

[7] The Sixth Circuit reached the same outcome in *Parker v. Tenneco*, 114 F.4th 786 (6th Cir. 2024*), cert. denied*, 145 S. Ct. 1060 (2025).

[8] *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) ("The FAA preempts any state rule discriminating on its face against arbitration—for example, a law 'prohibit[ing] outright the arbitration of a particular type of claim."); *see also id.* at 650–51 ("[E]ven rules that are generally applicable as a formal matter are not immune to preemption by the FAA."); *see also id.* at 651 ("That right would not be a right to *arbitrate* in any meaningful sense if generally applicable principles of state law could be used to transform traditiona[l] individualized . . . arbitration into the litigation it was meant to displace through the imposition of procedures at odds with arbitration's informal nature."); *see also Specialty Healthcare Mgmt., Inc. v. St. Mary Par. Hosp.*, 220 F.3d 650, 654 (5th Cir. 2000)

nor does either party allege, that the FAA preempts Texas law when it comes to interpreting the severability clause.

Whether a contract is ambiguous is a question of law. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). There is an ambiguity where a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation." *In re Davenport*, 522 S.W.3d 452, 456 (Tex. 2017). "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015) (quoting *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)).

"When construing a contract, the terms are typically given 'their plain, ordinary, and generally accepted meaning.'" *Davenport*, 522 S.W.3d at 456–57 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). Courts can look to dictionaries to discern the meaning of a commonly used term that isn't defined in the contract. *Id.* at 457. Unambiguous documents are enforced as written. *Id.*

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To achieve that objective, a court should "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Id.* "No single provision taken alone will be given

---

("The FAA, however, does not preempt all state law related to arbitration agreements."); *Stanford v. Brandon Nursing & Rehab. Ctr., L.L.C.*, 160 F.4th 118 (5th Cir. 2025) (applying state law when determining the existence of a valid arbitration agreement).

controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.*

Under Texas law, the contract is ambiguous, and the issue of severability is best decided in the first instance by the district court. Parrott's reading of the arbitration provision is plausible on its face but becomes less certain when the provision is looked at in context. The relevant portion of the provision states the following:

> The requirements that . . . no Arbitration Claimant shall be entitled to receive, and shall not be awarded any relief other than individual relief, shall govern irrespective of any rule of the AAA or decision to the contrary. The arbitrators shall consequently have no jurisdiction or authority to compel or permit any class, collective, group or representative action in arbitration, to consolidate different arbitration proceedings, or to join any other party to any arbitration.

Tension does exist between the capacious scope of the language "any . . . decision to the contrary" and the surrounding contractual context. As previously discussed, the word "any" (and by extension "any decision") has a broad scope and, without context, could only be read to be include a decision by a federal court, creating an exception to the severability provision in the contract.

The above being said, several facts that IBC highlights counsel against Parrott's reading. The "any decision" sentence is followed by a sentence that states that "the arbitrators shall *consequently* have no jurisdiction" to permit a representative action. "Consequently" implies a causal relationship and indicates that the lack of jurisdiction in the second sentence is caused by the rule in the first sentence. That information, combined with the fact that the "rule[s] of the AAA," mentioned in the first sentence, refer to the American Arbitration Association, which IBC designates as the provider of neutral candidates, creates a plausible reading that the "any decision" lan-

16

guage refers to decisions of the arbitrators. The causal-link issue, however, does not foreclose Parrott's reading because the provision can still be read to strip the arbitrators of authority based on the contrary decision of a court, making the provision ambiguous.

The ambiguity of the contractual provision means that we should remand to the district court, as the interpretation of an ambiguous contractual provision is a fact issue to be decided by the trier of fact.[9]

## IV. Does the Arbitration Provision Have Unlawful Exculpatory Provisions?

Title 29 U.S.C. § 1110(a) states that "[e]xcept as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." In this court's only case to address this provision, the court found that a time-limit provision of an arbitration agreement violated § 1110(a) "[t]o the extent [it] renders ineligible for arbitration ERISA claims more than six years old which could otherwise be enforced on proof of fraud or concealment," and held "it void with respect to those claims." *Kramer v. Smith Barney*, 80 F.3d 1080, 1085 (5th Cir. 1996). Parrott asserts that the representative-action waiver, remedy limitation, and standard of review provision (outlined below) are unlawful exculpatory provisions. We address only the standard-of-review provision, as the other two have already been deemed violations of the effective-vindication doctrine.

IBC contends that the standard-of-review provision is not an unlawful exculpatory provision because the arbitration agreement explicitly provides

---

[9] *See Coker*, 650 S.W.2d at 394 ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.").

that the "arbitrator(s) will apply the same standards of review to the Covered Claim as would apply if the Covered Claim had been filed in the United States District Court for the Western District of Texas." IBC maintains that the standard-of-review provision is limited to the extent that the Plan actually grants the fiduciaries discretion and that the provision tracks the holding in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Parrott contends that the standard-of-review provision is an unlawful exculpatory provision because it improperly lowers the standard of review and thus relieves the fiduciary of liability.

IBC disclaims that the provision applies the abuse-of-discretion standard of review in the context of fiduciary-duty cases by reasoning that the standard in *Firestone* is the standard that the standard-of-review provision applies. In *Kramer*, this court voided the time-limit provision only with respect to claims that it would violate. 80 F.3d at 1085. Given that IBC asserts that it does not believe the provision reaches breach-of-fiduciary-duty claims, and further given that Parrott correctly suggests that changing to a more deferential standard of review would, by definition, relieve the Plan's fiduciaries of liability, the standard-of-review provision is void to the extent that it expands beyond the reach of denial-of-benefits claims.

\* \* \* \* \*

We REVERSE the district court's denial of the motion to compel arbitration as to Parrott's § 1132(a)(2) claim, AFFIRM as to Parrott's individual claims, VOID the standard-of-review provision to the extent it purports to reach breach-of-fiduciary-duty claims, and REMAND for further proceedings on whether provisions that violate the effective vindication doctrine can be severed. We place no limitation on the matters that the district court may address on remand, and we make no suggestion as to what decisions it should reach.